IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY | : | CIVIL ACTION |
| 175 Berkeley Street | : | |
| Boston, MA  02117, | : | NO. 25-cv-973 |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| THE ARNOLD ENGINEERING COMPANY | : | |
| k/n/a ARNOLD MAGNETIC TECHNOLOGIES | : | |
| 770 Linden Avenue | : | |
| Rochester, NY 14625, | : | |
| Defendant | : | |

**COMPLAINT**

NOW COMES, the Plaintiff, Liberty Mutual Insurance Company ("Liberty Mutual"), by and through its attorneys, and files the following Complaint against The Arnold Engineering Company k/n/a Arnold Magnetic Technologies ("Arnold"), and in support thereof avers as follows:

**THE PARTIES**

1.      Liberty Mutual is a Massachusetts mutual insurance company organized and existing under the laws of the Commonwealth of Massachusetts with its principal place of business at 175 Berkeley Street, Boston, Massachusetts.

2.      On information and belief, Arnold is a Delaware corporation with its principal place of business in New York and conducts business in Pennsylvania.

3.      On information and belief, Arnold owned and operated a manufacturing facility at the property located at 300 North West Street, Marengo, McHenry County, Illinois (the "Site") where Arnold utilized chlorinated solvents in its production processes at the Site.

4.    On information and belief, Arnold's former corporate parent is Allegheny International, Inc., a Pennsylvania corporation.

5.    Certain of the insurance policies (discussed below) that are the subject of this action and under which Arnold seeks coverage, were issued to Arnold's former corporate parent, Allegheny International, Inc. ("Allegheny International"), a Pennsylvania corporation.  A true and correct copy of a document entitled "THE EVOLUTION OF ARNOLD: Key Sales & Acquisitions that Shaped Arnold Magnetic Technologies", retrieved from https://www.arnoldmagnetics.com/wp-content/uploads/2021/11/Evolution-of-Arnold-1895-2021.pdf on 5/30/2025 at 1:37 p.m. EST, is attached hereto as Exhibit 1.

6.    Certain of the insurance policies (discussed below) that are the subject of this action and under which Arnold seeks coverage, were issued to Arnold's former corporate parent, Allegheny Ludlum Industries, Inc. ("Allegheny Ludlum"), a Pennsylvania corporation.  *See* Ex. 1.

7.    Another of the insurance policies that is the subject of this action, and under which Arnold seeks coverage, was issued to SPS Technologies, Inc., another of Arnold's former corporate parents, and a Pennsylvania corporation.  *See* Ex. 1.

## JURISDICTION AND VENUE

8.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, in that complete diversity of citizenship exists between the Plaintiffs, on the one hand, and Defendants, on the other hand, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

9.    Venue of this action is proper in this Court pursuant to 28 U.S.C. § 1391(b), in that a substantial part of the events giving rise to this insurance coverage dispute have occurred in this

District.  Specifically, insurance policies under which Arnold seeks coverage were issued to Arnold's former corporate parent, Allegheny International, in Pittsburgh, PA.  *See* Ex. 1.

## NATURE OF THE ACTION

10.    This is an action brought pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, and various statutory, codified, and common laws seeking, *inter alia*, declaratory relief as to the rights and obligations of the parties under comprehensive general liability insurance policies ("Liberty CGL Policies") issued by Liberty Mutual with respect to the Site (the "Pollution Claim").

11.    Liberty Mutual seeks a declaratory judgment that it does not have an obligation to defend or indemnify Arnold in connection with the Pollution Claim for, among others, the following reasons: (1) the pollution exclusions in the Liberty CGL Policies bar coverage to Arnold for claims arising out of the Site; (2) Exclusion (k) in the Liberty CGL Policies bars coverage to Arnold for claims arising out of the Site; (3) Liberty Mutual was not provided timely notice, which is a condition to coverage under the Liberty CGL Policies; and (4) Arnold incurred obligations without Liberty Mutual's consent, which is a condition to coverage under the Liberty CGL Policies.

## FACTUAL BACKGROUND

### I.    THE POLLUTION CLAIM

#### A.    The Underlying Lawsuits

##### 1.    The Underlying IEPA Lawsuit

12.    On July 1, 2013, the Attorney General of the State of Illinois, on her own motion and at the request of the Illinois Environmental Protection Agency (the "IEPA", with the Attorney General, the "Underlying IEPA Plaintiffs") filed a Complaint against Arnold and 300 West LLC

3

("300 West") seeking various orders against Arnold and 300 West relating to groundwater contamination at the Site (the "IEPA Complaint") (the "Underlying IEPA Lawsuit"). A true and correct copy of the IEPA Complaint is attached hereto as "Exhibit 2".

13.    The Underlying IEPA Plaintiffs filed a First Amended Complaint in the Underlying IEPA Lawsuit on March 26, 2015 (the "First Amended IEPA Complaint"). A true and correct copy of the First Amended IEPA Complaint is attached hereto as "Exhibit 3".

14.    The Underlying IEPA Plaintiffs alleges that between "at least 1970 and January 2005," Arnold owned the Site. Ex. 3, ¶ 5.

15.    The Underlying IEPA Plaintiffs allege that, on or about May 25, 2006, 300 West purchased the Site and continues to own the Site. Ex. 3, ¶ 6.

16.    The Underlying IEPA Plaintiffs allege that since May 2006, Arnold has leased the Site from 300 West "and conducted manufacturing operations at the Site." Ex. 3, ¶ 7.

17.    The Underlying IEPA Plaintiffs allege that prior to 2002, Arnold utilized chlorinated solvents in its production processes at the Site, "including without limitation, 1, 1, 1-trichloroethane ("TCA"), perchloroethylene ("PCE"), and trichloroethylene ("TCE"). Ex. 3, ¶ 9.

18.    The Underlying IEPA Plaintiffs allege that between approximately 1950 and 1990, Arnold utilized 12 underground storage tanks (USTs) at the Site for the storage of mineral oil, acetone, methanol, TCA, kerosene and gasoline. Ex. 3, ¶ 10.

19.    The Underlying IEPA Plaintiffs allege that between 1989 and 1991, Arnold put solvents, including acetone, methanol, methyl ethyl ketone, and TCA down drains at the Site, which migrated into wastewater treatment ponds (the "Ponds") located at the Site. Ex. 3, ¶ 11-12.

20.     The Underlying IEPA Plaintiffs allege that between the mid-1980s and 2006, Arnold also dumped phosphoric acid into the Ponds. Ex. 3, ¶ 13.

21.     300 West allegedly enrolled the Site in IEPA's "Site Remediation Program." Ex. 3, ¶ 18.

22.     The Underlying IEPA Plaintiffs allege that IEPA issued a Violation Notice (L-2008-01057) to Arnold on February 28, 2008 due to chlorinated solvent groundwater contamination existing on the Site, including TCA, PCE, and other related contaminants, for, approximately, the preceding 20 years (the "Arnold Violation Notice"). Ex. 3, ¶ 16.

23.     IEPA issued a similar Violation Notice (L-2008-001123) on April 15, 2008 to 300 West (the "300 West Violation Notice"). Ex. 3, ¶ 17.

24.     Since entering the Site Remediation Program, 300 West has conducted on-Site and off-Site groundwater sampling from monitoring wells, on-Site soil sampling, and obtained sampling results showing TCA and PCE contamination in on-Site soils. Ex. 3, ¶¶ 19-21.

25.     The Underlying IEPA Plaintiffs allege 300 West has failed to investigate and remediate the chlorinated solvent contamination at the Site. Ex. 3, ¶ 22.

26.     The Underlying IEPA Plaintiffs allege an environmental consultant retained by 300 West collected samples of groundwater from monitoring wells located on-Site and testing revealed contamination from 1,1-DCE, PCE, and TCE. Ex. 3, ¶ 34.

27.     The Underlying IEPA Plaintiffs allege that the same environmental consultant collected samples of groundwater from monitoring wells located fifty feet away from the northwest portion of the Site and from private wells located north-northwest and within one mile of the Site. Both groupings of samples revealed contamination from Chlorinated VOCs. Ex. 3, ¶ 35-36.

5

28.    The Underlying IEPA Plaintiffs allege that Chlorinated VOCs released at the Site "have entered the groundwater and impacted residential potable water wells" and exceeded Class I Groundwater Quality Regulations in at least two drinking water wells.  Ex. 3, ¶ 37.

29.    The Underlying IEPA Plaintiffs allege that Arnold and 300 West "caused, threatened or allowed the discharge and migration of the Chlorinated VOCs into groundwater at the Site.  The Chlorinated VOCs were allowed to migrate into groundwater underlying the Site and into off-Site groundwater, including into private water wells located in close proximity to the north-northwest boundary of the Site, impacting drinking water."  Ex. 3, ¶ 48.

30.    The Underlying IEPA Plaintiffs allege that "[t]he Chlorinated VOCs migrating to groundwater at and near the Site created, or threatened to create, a nuisance and rendered the groundwater harmful to human health and the environment, which constitutes water pollution" as defined by 415 ILCS 5/3.545 (2014).  Ex. 3, ¶ 49.

31.    The Underlying IEPA Plaintiffs seek civil penalties against Arnold and 300 West pursuant to Section 42(a) of 415 ILCS 5/42 (2014).  Ex. 3, Counts I-II.

32.    The Underlying IEPA Plaintiffs also seek to recover the removal and/or remedial costs incurred by the State of Illinois with respect to the Site.  Ex. 3, Count III.

**2.    The Underlying Lewis Lawsuit**

33.    On or about June 6, 2018, Michael Lewis and Geneva D. Lewis (collectively, the "Lewises") filed a Complaint against Arnold, 300 West, and others (the "Lewis Complaint") (the "Underlying Lewis Lawsuit").  A true and correct copy of the Lewis Complaint is attached hereto as "Exhibit 4".

34.     The Lewises filed a First Amended Complaint on or about November 15, 2018 (the "Underlying First Amended Lewis Complaint").  A true and correct copy of the Underlying First Amended Lewis Complaint is attached hereto as "Exhibit 5".

35.     In the Underlying First Amended Lewis Complaint, the Lewises allege, similar to the Underlying IEPA Plaintiffs, that Arnold discharged contaminants into groundwater from the Site, which caused "the water in their home and on their Property [to be] polluted with dangerous chemicals, including, but not limited to, 1,1-Dichloroethene and Trichloroethene."  *See, e.g.*, ¶ 1.

36.     The Underlying Lewis Lawsuit was settled and dismissed with prejudice on or about May 3, 2022.  A true and correct copy of the Stipulation of Dismissal for the Underlying Lewis Lawsuit is attached hereto as "Exhibit 6".

### 3.     The Underlying Anthony Lawsuit

37.     On or about June 1, 2018, Steven Anthony, Ann Anthony, and others (collectively, the "Underlying Anthony Plaintiffs") filed a Complaint against Arnold, 300 West, and others (the "Underlying Anthony Complaint") (the "Underlying Anthony Lawsuit").

38.     The Underlying Anthony Plaintiffs filed a First Amended Complaint on or about September 4, 2018 (the "Underlying First Amended Anthony Complaint").  A true and correct copy of the Underlying First Amended Anthony Complaint is attached hereto as "Exhibit 7".

39.     The Underlying Anthony Plaintiffs, like the Lewises and the Underlying IEPA Plaintiffs, allege that Arnold discharged contaminants into groundwater which caused the Underlying Anthony Plaintiffs' drinking water to become "hazardous and unsafe to drink or use."  *See, e.g.*, ¶ 13.

7

40.    A review of the docket for the Underlying Anthony Lawsuit indicates that the Anthony Plaintiffs filed subsequent amended complaints on June 19, 2019; September 24, 2020; and May 19, 2023.

41.    The undersigned is not in possession of these amended complaints; on information and belief, Arnold is in possession of the subsequent amended complaints.

42.    A review of the docket also indicates that the Underlying Anthony Lawsuit was dismissed with prejudice on or about October 20, 2023.

43.    The undersigned is not in possession of the stipulation of dismissal; on information and belief, Arnold is in possession of the stipulation of dismissal.

**B.    The Injunction Orders**

44.    On June 14, 2013, the Court in the Underlying IEPA Lawsuit entered the Agreed Immediate Injunction Order.  A true and correct copy of the Agreed Immediate Injunction Order is attached hereto as "Exhibit 8".

45.    On August 23, 2013, the Court entered the Agreed Preliminary Injunction Order, which superseded the Agreed Immediate Injunction Order.  A true and correct copy of the Agreed Preliminary Injunction Order is attached hereto as "Exhibit 9".

46.    On June 11, 2014, the Court entered the Second Agreed Preliminary Injunction Order, which superseded the Agreed Preliminary Injunction Order.  A true and correct copy of the Second Agreed Preliminary Injunction Order is attached hereto as "Exhibit 10".

47.    On information and belief, on or about March 12, 2015, a First Agreed Modification to the Second Agreed Preliminary Injunction Order was filed with the Court.

48.     On information and belief, on or about May 8, 2015, a Second Agreed Modification to the Second Agreed Preliminary Injunction Order was filed with the Court.

49.     On information and belief, on or about December 14, 2015, the Court entered the Third Agreed Preliminary Injunction Order, which superseded the Second Agreed Preliminary Injunction Order.

50.     These orders, collectively, are referred to as the Injunction Orders.

51.     The Injunction Orders were superseded by the Consent Order.

**C.      The Consent Order**

52.     On or about June 1, 2016, Underlying Plaintiffs, 300 West, and Arnold entered into a Consent Order to settle the Underlying Lawsuit.  A true and correct copy of the Consent Order is attached hereto as "Exhibit 11".

53.     The Consent Order contains stipulated facts that are agreed upon for the purposes of settlement only and as a factual basis for the Circuit Court of the Twenty-Second Judicial Circuit, McHenry County, IL, Chancery Division to enter the Consent Order.

54.     Pursuant to the Consent Order, Underlying Plaintiffs contend that Arnold and 300 West violated the following provisions of the Illinois Environmental Protection Act (the "Act"):

|  |  |
|---|---|
| Count I: | Substantial Danger to the Environment, Public Health and Welfare in violation of Section 43(a) of the Act, 415 ILCS 5/43(a) (2014). |
| Count II: | Water Pollution in violation of Section 12(a) of the Act, 415 ILCS 5/12(a) (2014). |
| Count III: | Cost Recovery pursuant to Section 22.2(f) of the Act, 415 ILCS 5/22.2(f) (2014). |

55.    As detailed in the Consent Order, pursuant to the terms of the Injunction Orders, Arnold and 300 West were conducting certain called-for interim activities, such as providing bottled water to owners of impacted private water wells; conducting sampling of drinking water on July 8-9, 2013; retaining a project manager on February 19, 2016 to oversee the completion of certain obligations set forth in the Consent Order; and, on March 31, 2016, submitting to the IEPA for review and approval, a Comprehensive Site Investigation and Remediation Objectives Report for work on-Site and off-Site.

56.    As part of the Consent Order, Arnold and 300 West agreed to the following obligations:

### A.    Civil Penalty, Stipulated Penalty, Cost Recovery and Litigation Cost Payments

1.    The Defendants shall jointly and severally pay a civil penalty of One Hundred Thousand Dollars ($100,000.00). Payment shall be tendered at the time of entry of the Consent Order. The civil penalty payment shall be made by certified check or money order payable to the Illinois EPA for deposit into the Environmental Protection Trust Fund ("EPTF"). The case name and case number shall appear on the face of the certified check or money order.

2.    The Defendants shall jointly and severally pay a stipulated penalty in the amount of Thirty Thousand Dollars ($30,000.00) for alleged violations of the Prior Orders from June 14, 2013 to the date of the entry of the Consent Order. Payment shall be tendered at the time of entry of the Consent Order. The stipulated penalty payment shall be made by certified check or money order payable to the Illinois EPA for deposit into the EPTF. The case name and case number shall appear on the face of the certified check or money order.

3.    The Defendants shall jointly and severally pay the outstanding costs incurred by the Illinois EPA

through the date of December 31, 2015 in the amount of $70,393.72 by certified check or money order made payable to the Illinois EPA for deposit into the Hazardous Waste Fund. Payment shall be tendered at the time of entry of the Consent Order. The case name, case number, LPC #1110650003, and LP 52-62W shall appear on the face of the certified check or money order.

4.      The Defendants shall jointly and severally pay the sum of $13,892.44 to the Illinois Attorney General for costs incurred up to entry of this Consent Order related to this case. Payment shall be made in the form of a certified check or money order made payable to the "Illinois Attorney General State Projects and Court Ordered Distribution Fund (801 Fund)" for subsequent expenditure as authorized by the Illinois Attorney General, and tendered at time of entry of the Consent Order. The case name and case number shall appear on the face of the certified check or money order.

* * *

**D.      Future Compliance**

1.      **Bottled Water Delivery.**

a.      The Defendants are currently providing bottled water to certain private water well owners and shall continue to provide bottled water to the owners of the private water wells located at 4106 Ritz Road, 4210 Ritz Road, 4805 Ritz Road, 4907 Ritz Road, 4913 Ritz Road, 5010 Ritz Road, 5011 Ritz Road, 21902 Railroad St. and 22104 Railroad St. in Marengo, McHenry County, Illinois (collectively, the "Private Well Properties") by replenishing the water consumed by the residents in each Private Well Property so as to provide at least two (2) gallons per person per day at each Private Well Property, on a weekly basis or such other schedule as agreed to in writing by the resident.

11

\* \* \*

2.    Well Water Sampling. The Defendants shall conduct water sampling at the private water wells listed below as follows:

a.    Subject to Paragraph III.D.2.h. herein, the Defendants shall cause water sampling to be conducted from the drinking water wells at the following properties in Marengo, McHenry County, Illinois (the "Water Sampling Properties"):

| | |
|---|---|
| 4501 Ritz Road | 4106 Ritz Road |
| 4210 Ritz Road | 4805 Ritz Road |
| 4907 Ritz Road | 4913 Ritz Road |
| 5011 Ritz Road | 5017 Ritz Road |
| 5010 Ritz Road | 22110 Railroad St. |
| 22104 Railroad St. | 22014 Railroad St. |
| 21902 Railroad St. | 21816 Railroad St. |
| 21820 Railroad St. | 21606 Railroad St. |
| 21602 Railroad St. | |

b.    The Defendants shall test each water sample for 1,1-Dichloroethylene, 1,1,1-Trichloroethane, cis-1,2-Dichloroethylene, 1,2-Dichloroethane, trans-1,2-Dichloroethylene, Trichloroethylene, Tetrachloroethylene, Vinyl Chloride, Chloroform, Bromodichloromethane, Bromomethane and 1,4-Dioxane (P-Dioxane) (collectively referred to herein as the "Chlorinated VOCs").

\* \* \*

3.    ***Hook-ups of Residential Homes to City of Marengo Public Water Supply.***

12

a.    ***Defendants' Obligations.*** Subject to the conditions set forth in this Section III.D.3., and in accordance with the Schedule attached hereto as Exhibit B, the Defendants shall:

    i.    Perform all of the work associated with, and necessary to accomplish, hooking up the properties set forth on Exhibit C attached hereto (the "Hook-up Properties") to the City of Marengo municipal water supply, . . .

    ii.   Pay all costs associated with the work required under Paragraph III.D.3.a.i.; . . .

    iv.   Pay to the owner of each Hook-up Property that enters into a Hook-up Access Agreement the amount of $2,400.00, in a certified check or money order, for the estimated cost of the City of Marengo municipal water for residential use (calculated as $100.00 x 4 quarters x 5 years = $2,000.00 + $400.00 (20% x 2000 (cushion for potential rate increases)) = $2,400.00).

                * * *

6.    ***Remedial Action Plan.***

a.    Within sixty (60) calendar days of the Illinois EPA's approval of the Comprehensive Site Investigation and Remediation Objectives Report, the Defendants shall submit to the Illinois EPA, pursuant to Section III.H. herein, for the Illinois EPA's review and approval, a Remedial Action Plan that meets the requirements of Exhibit F. . . .

d.    Upon approval of the Remedial Action Plan(s) by the Illinois EPA, the Defendants shall implement the approved Remedial Action Plan(s) in accordance with the approved schedule and the terms contained in the approved Remedial Action Plan(s), including

any modifications thereto and consistent with the Illinois EPA-approved remediation objectives.

\* \* \*

9.     ***Cost Recovery.***

a.     The Defendants shall jointly and severally reimburse the Illinois EPA for all reasonable and necessary costs incurred and documented by the Illinois EPA in its oversight of the investigation of the Site and such other areas beyond the Site that the Defendants may be required to investigate and/or remediate for soil and groundwater contamination pursuant to and in accordance with this Consent Order, and its review and evaluation of documents and reports submitted to it pursuant to the Consent Order, including, but not limited to, all costs associated with Community Relations activities ("Response Costs"). Response Costs shall include all unpaid, reasonable and necessary, (i) direct program, (ii) allocated program and (iii) indirect costs, incurred by the Illinois EPA on and after January 1, 2016: . . .

\* \* \*

57.    The Consent Order provides that it is "a binding and enforceable order of this Court."

58.    The Consent Order further provides that in consideration of Arnold and 300 West's payment of a $100,00.00 civil penalty, payment of a $30,000.00 stipulated penalty, payment of the outstanding Illinois EPA costs in the amount of $70,393.72, payment of the Office of the Illinois Attorney General's litigation costs in the amount of $13,892.44, and completion of all activities required in the Consent Order, the Underlying Plaintiffs release, waive and discharge Arnold and 300 West from any further liability, obligations or civil penalties for the violations of the Act that were the subject matter of the First Amended Complaint and from any stipulated penalties for any

alleged violations of the Injunction Orders occurring prior to the date of the entry of the Consent Order.

59.    The Consent Order has been subsequently modified.    Copies of the publicly-available modified Consent Order are attached hereto as Exhibits 12 and 13.

## II.    POLICY TERMS

60.    Liberty Mutual issued the following Commercial General Liability policies under which it is participating in Arnold's defense under a full and complete reservation of rights (collectively, the "Liberty CGL Policies"):

| Policy Number: | Effective Dates: |
|---|---|
| LG1-681-004050-046 | 1/1/1976-1/1/1977 |
| LG1-681-004050-047 | 1/1/1977-1/1/1978 |
| LG1-681-004050-128 | 7/1/1978-7/1/1979 |
| LG1-681-004050-129 | 7/1/1979-7/1/1980 |
| LG1-681-004050-120 | 7/1/1980-7/1/1981 |
| LG1-681-004050-121 | 7/1/1981-7/1/1982 |
| LG1-681-004050-122 | 7/1/1982-7/1/1983 |
| LG1-681-004050-123 | 7/1/1983-7/1/1984 |
| LG1-681-004050-124 | 7/1/1984-7/1/1985 |
| LG1-681-004050-125 | 7/1/1985-7/1/1988 |
| LG1-131-029075-036 | 10/1/1986-10/1/1987 |

61.    Liberty Mutual has denied indemnity coverage to Arnold under the Liberty CGL Policies.    A copy of Liberty Mutual's March 6, 2025 indemnity denial letter is attached hereto as Exhibit 14.

62.    The Liberty CGL Policies include provisions such as or similar to the following, which appear in the Liberty CGL Policy with a policy period of January 1, 1980 to January 1, 1981:

**COVERAGE A.    BODILY INJURY LIABILITY**

**COVERAGE B.    PROPERTY DAMAGE LIABILITY**

The company will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of:

Coverage A. **bodily injury** or

Coverage B. **property damage**

to which this policy applies, caused by an **occurrence**, and the company shall have the rights and duty to defend any suit against the **insured** seeking damages on account of such **bodily injury** or **property damage**, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

**Exclusions**

This policy does not apply to:

\* \* \*

(f)    to **bodily injury** or **property damage** arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;

\* \* \*

(k)    to **property damage** to

(1)    property owned or occupied by or rented to the insured, or

(2)    property used by the insured, or

16

(3)    property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control . . .

\* \* \*

## DEFINITIONS

\* \* \*

**"insured"** means any person or organization qualifying as an insured in the "Persons Insured" provision of the applicable insurance coverage. The insurance afforded applies separately to each **insured** against whom claim is made or suit is brought, except with respect to the limits of the company's liability;

\* \* \*

**"occurrence"** means an accident, including injurious exposure to conditions, which results, during the policy period, in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the **insured**;

\* \* \*

**"property damage"** means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an **occurrence** during the policy period.

\* \* \*

## CONDITIONS

\* \* \*

**Insured's Duties in the Event of Occurrence, Claim or Suit**

(a)    In the event of an **occurrence,** written notice containing particulars sufficient to identify the **insured** and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or

for the **insured** to the company or any of its authorized agents as soon as practicable.

(b)    If claim is made or suit is brought against the **insured,** the **insured** shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

(c)    The insured shall cooperate with the company and, upon the company's request, assist in making settlements. in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damage with respect to which insurance is afforded under this policy: and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment. assume any obligation or incur any expense other than for first aid to others at the time of accident.

\*    \*    \*

63.    The applicable limits of the Liberty CGL Policies are subject to any exhaustion or impairment that may have occurred.

64.    Liberty CGL Policy no. LG1-681-004050-125 contains the following absolute pollution exclusion:

**POLLUTION EXCLUSION**

It is agreed that the exclusion relating to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants is replaced by the following:

(1)    to **bodily injury** or **property damage** arising out actual or alleged or threatened discharge, dispersal, release or escape of pollutants:

(a)    at or from premises owned, rented or occupied by the **named insured**;

18

(b)     at or from any site or location used by or for the **named insured** or others for the handling, storage, disposal, processing or treatment of waste;

(c)     which are at any time transported, handled, stored, treated, disposed of or processed as waste by of for the **named insured** or any person or organization for whom the named insured may be legally responsible; or

(d)     At or from any site or location on which the **named insured** or any contractors or subcontractors working directly or indirectly on behalf of the **named insured** are performing operations:

(i)     if the pollutants are brought on or to the site or location in connection with such operations; or

(ii)    if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants.

(2)     to any loss, cost or expense arising out of any governmental direction or request that the named insured test for, monitor, clean up, remove, treat, detoxify, or neutralize pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

It is further agreed that Endorsement 27 is canceled.[1]

65.     Liberty CGL Policy no. LG1-131-029075-036 contains the following pollution exclusion:

---

[1] Endorsement 27 refers to the claims-made Pollution Liability Coverage Endorsement in Liberty CGL Policy no. LG1-681-004050-125

## POLLUTION EXCLUSION

It is agreed that the exclusion relating to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants is replaced by the following:

(1)     to **bodily injury** or **property damage** arising out actual or alleged or threatened discharge, dispersal, release or escape of pollutants:

    (a)     at or from premises owned, rented or occupied by the **named insured**;

    (b)     at or from any site or location used by or for the **named insured** or others for the handling, storage, disposal, processing or treatment of waste;

    (c)     which are at any time transported, handled, stored, treated, disposed of or processed as waste by or for the **named insured** or any person or organization for whom the **named insured** may be legally responsible; or

    (d)     At or from any site or location on which the **named insured** or any contractors or subcontractors working directly or indirectly on behalf of the **named insured** are performing operations:

        (i)     if the pollutants are brought on or to the site or location in connection with such operations; or

        (ii)     if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants.

(2)     to any loss, cost or expense arising out of any governmental direction or request that the named insured test for, monitor, clean up, remove, treat, detoxify, or neutralize pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Subparagraphs(a) and(d)(i) of paragraph (1) of this exclusion do not apply to **bodily injury** or **property damage** caused by heat, smoke or fumes from a hostile fire. As used in this exclusion, a hostile fire means one that becomes uncontrollable or breaks out from where it was intended to be.

## III.    HISTORY OF THE POLLUTION EXCLUSION IN PENNSYLVANIA

66.    The Insurance Rating Bureau and Mutual Insurance Rating Bureau (collectively, the "Bureaus") submitted a cover letter with a proposed form of the Pollution Exclusion to the Pennsylvania Insurance Department on June 10, 1970, which requested approval "[s]ince there is a great concern by the companies for the adoption of these exclusions, we respectfully request your favorable consideration of the submission."   A copy of this cover letter is attached hereto as "Exhibit 15".

67.    The explanation attached to the June 10, 1970 cover letter submitted by the Bureaus with the pollution exclusion consisted of three sentences:

> Coverage for pollution or contamination is not provided in most cases under present policies because the damage can be said to be expected or intended and thus are excluded by the definition of occurrence.   The above exclusion clarifies the situation so as to avoid any question of intent. Coverage is continued for pollution or contamination caused injuries when the pollution or contamination results from an accident. . . .

A copy of the explanation submitted by the Bureaus is attached hereto as "Exhibit 16".

### THE PARTIES' DISPUTES

## IV.    THE POLICY IS SUBJECT TO INTERPRETATION UNDER PENNSYLVANIA LAW

68.    Each of the Liberty CGL Policies under which Liberty Mutual is participating in Arnold's defense (pursuant to a full reservation of rights) is subject to interpretation under Pennsylvania law.

69.    Policy nos. LG1-681-004050-046, -047, and -048 were issued to Allegheny Ludlum Industries, Inc. at a Pittsburgh, Pennsylvania address.

70.    Policy nos. LG1-681-004050-128, -129, -120, -121, -122, -123, -124, and -125 were issued to Allegheny International, Inc. at a Pittsburgh, Pennsylvania address.

71.    Policy no. LG1-131-029075-036 was issued to SPS Technologies, Inc. at a Newtown, Pennsylvania address.

72.    The connection to Pennsylvania is evident from a review of the Declarations pages to each of the Liberty CGL Policies.

73.    As set forth above, the Declarations pages to each of the Liberty CGL Policies reflect that the Named Insured's address is listed in Pennsylvania.

74.    The Declarations pages also reflect sales offices in Pennsylvania.

75.    Further, the Liberty CGL Policies each reflect that the organization named in Item 1 of the declarations (the Pennsylvania Named Insureds) are authorized to act and agree to act on behalf of all persons or organizations insured under the Liberty CGL Policies with respect to all matters pertaining to the insurance afforded by the Liberty CGL Policies, including the payment of premiums.

76.    Therefore, the Liberty CGL Policies are subject to interpretation under Pennsylvania law.

## V.    THE POLLUTION EXCLUSIONS IN THE POLICIES BAR COVERAGE FOR THE POLLUTION CLAIM

77.    There can be no dispute that the pollution exclusions in the Liberty CGL Policies are triggered.

78.     As set forth above, the Underlying Lawsuit alleges that chemicals were routinely dumped into an unlined ditch and liquid seeped into the ground surface and there is no evidence that the pollution at the site was "sudden and accidental," such that the "sudden and accidental" pollution exclusions in certain of the Liberty CGL Policies does not apply, which is, as discussed below, Arnold's burden to prove.  *Cf. Millers Capital Ins. Co. v. Gambone Bros. Dev. Co.*, 941 A.2d 706, 713 (Pa. Super. Ct. 2007) ("[N]atural and foreseeable acts, such as rainfall, which tend to exacerbate the damage, effect, or consequences caused ab initio by [the insured's operations] also cannot be considered sufficiently fortuitous to constitute an "occurrence" or "accident" for the purposes of an occurrence based CGL policy"), *appeal denied*, 963 A.2d 471 (Pa. 2008).

79.     Pennsylvania courts have found the absolute pollution exclusion to be unambiguous.  *See, e.g.*, *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 109 (Pa. 1999).

80.     The "sudden and accidental" pollution exclusion has likewise been held to be unambiguous.  *See Lower Paxton*, 557 A.2d at 399 ("[T]he pollution exclusion is not ambiguous and must be accorded its plain meaning"); *Techalloy Co. v. Reliance Ins. Co.*, 487 A.2d 820, 827 (Pa. Super. Ct. 1984) ("[T]he language of the policy unambiguously states that there will be no coverage for toxic discharge into the environment unless that discharge is both sudden and accidental); *cf. Leccese v. Allstate Prop. & Cas. Ins. Co.*, 630 F. Supp. 3d 628, 633 (E.D. Pa. 2022) (noting in the context of interpreting an insuring agreement for a homeowners' policy that "the terms 'sudden' and 'accidental' in the Policy are unambiguous.").

81.     Under Pennsylvania law, the insured bears the burden of proving the applicability of an exception to an exclusion.  *Jugan v. Econ. Premier Assurance Co.*, 728 F. App'x 86, 90 (3d

Cir. 2018) ("After the insured has met that burden, the burden shifts to the insurer to prove the applicability of an exclusion in the insurance policy. If the insurer demonstrates that an exclusion applies, the burden shifts back to the insured to prove an exception to the exclusion, such that the damages claimed are covered notwithstanding the exclusion.") (citations omitted).

82.    Specifically, in the context of the sudden and accidental exception to the pollution exclusion, it is established law that "[w]hile the insurer bears the burden of proving that the pollution exclusion applies to prevent coverage, the burden of establishing the 'sudden and accidental' exception to the pollution exclusion rests with the insured." *Bituminous Cas. Corp. v. Hems*, No. 06-1047, 2007 U.S. Dist. LEXIS 38429, at *19 (E.D. Pa. May 3, 2007).

83.    Therefore, Arnold carries the burden of proving affirmatively that its releases were "sudden and accidental." Liberty Mutual is not required to prove the negative by showing the absence of a "sudden and accidental" event.

84.    Therefore, there is no coverage under the Liberty CGL Policies for the Pollution Claim.

85.    The pollution exclusions are also unambiguous under Pennsylvania law, even when applied to permitted activities.

86.    As construed by the Pennsylvania Superior Court in *Lower Paxton*, the "meaning" of the "sudden and accidental" exception "is simply that damages resulting from a pollution discharge are covered only if the discharge itself is both sudden, meaning abrupt and lasting only a short time, and accidental, meaning unexpected." *Lower Paxton*, 557 A.2d at 399.

87.    That the discharge(s) causing the damages at issue were potentially the result of permitted activities does not save an insured from the application of the sudden and accidental pollution exclusion.

88.    This argument would read out not only the exclusion for damages resulting from the discharge, dispersal, release or escape of, *inter alia*, irritants, contaminants or pollutants but also the "sudden and accidental" exception, which requires that a release be "unexpected."

89.    If damages result from an expected discharge of pollutants, there is—without a doubt—no coverage under the Liberty CGL Policies.  *See, e.g.*, *Fischer & Porter Co. v. Liberty Mut. Ins. Co.*, 656 F. Supp. 132, 140 (E.D. Pa. 1986) ("Contamination that results from continuous dumping of toxic chemicals into drains or into compactors or tanks that would, in turn, spill into drains or onto the ground is not sudden, even if one could argue that the spillage was accidental or the resulting damage unexpected.").

## VI.    THERE IS NO "PERSONAL INJURY" COVERAGE AVAILABLE

90.    Policy no. LG1-131-029075-036 does not provide "personal injury" coverage for Arnold.

91.    While that policy contains Endorsement no. 53, which deletes reference to Endorsement 46, Endorsement 53 does not delete the sudden and accidental pollution exclusion which is included in the corresponding Commercial General Liability Coverage Form.  *See* Endorsement 53 ("It is agreed that all reference to Pollution Exclusion End. #46 is deleted from this policy.").

92.    The pollution exclusion in policy no. LG1-131-029075-036 provides that there is no coverage under the policy for "**bodily injury** or **property damage** arising out of the discharge,

dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental."

93.     Under Pennsylvania law, "personal injury" coverage parts do not provide coverage for environmental damage claims.  *See O'Brien Energy Sys., Inc. v. Am. Emp'rs Ins. Co.*, 629 A.2d 957, 964 (Pa. Super. Ct. 1993).

94.     Pennsylvania law directs that "to allow the manner in which the complainant frames the request for redress to control in a case such as this one would encourage litigation through the use of artful pleadings designed to avoid exclusions in liability insurance policies."  *Mut. Benefit Ins. Co. v. Haver*, 725 A.2d 743, 745 (Pa. 1999).

95.     Pennsylvania courts have repeatedly found that the pollution exclusion should be applied "broadly" and that the exclusion is "unambiguous" and "all encompassing."  *See, e.g.*, *Techalloy Co.*, 487 A.2d at 827 (holding that Reliance was not under a duty to defend Techalloy in the underlying tort action "because of the existence of the exclusion"); *Hussey Copper, Ltd. v. Arrowood Indem. Co.*, 391 F. App'x 207, 209 (3d Cir. 2010) ("Courts within and outside of Pennsylvania have interpreted this pollution exclusion provision broadly.") (citation omitted); *Coal Heat, Inc. v. United States Fid. & Guar. Co*., No. 99-cv-5647, 2000 U.S. Dist. LEXIS 16059, at *23 (E.D. Pa. Nov. 2, 2000); *Madison Constr. Co.*, 735 A.2d at 109, 110; *O'Brien Energy Sys.*, 629 A.2d at 962 (describing a pollution exclusion as "an unambiguous, all encompassing disclaimer of coverage for damages caused by a migration of polluting [substances]") (citation omitted).

96.     In accord with Pennsylvania's broad application of the pollution exclusion, Pennsylvania courts hold that insureds may not use coverage for enumerated, specific "personal injury" offenses to escape the applicability of the pollution exclusion.

97.     In *O'Brien*, the seminal case on the interaction between "personal injury" coverage for specific offenses and the pollution exclusion, the Pennsylvania Superior Court held that the pollution exclusion was "equally applicable to claims for personal injury caused by a wrongful entry or eviction" because "[t]he insurer did not eliminate the exclusionary language by providing additional coverage of the type listed in the 'personal injury' endorsement."  629 A.2d at 963.

98.     The court in *O'Brien* further reasoned that the personal injury endorsement extends liability coverage to the specific torts there enumerated:

> The personal injury endorsement affords coverage only for defined risks: These include torts of a recognized type involving damages which can be lumped under the descriptive term "personal injury." **The coverage does not provide indemnification for environmental damage claims based on migrating gases.** Coverage for such claims is specifically excluded by the pollution exclusion.

*Id.* at 964 (emphasis added).

99.     According to the Pennsylvania Superior Court, "[t]o hold otherwise would emasculate the clear and unambiguous provisions of the pollution exclusion and could not be justified except as an unwarranted straining to reach a result different than that intended by the parties."  *Id.*

100.    *O'Brien* is the law in Pennsylvania.

101.    Under *O'Brien*, advertising and personal injury coverage does not override the unambiguous pollution exclusion because, to hold otherwise, would "emasculate the clear and

unambiguous provisions of the pollution exclusion and could not be justified except as an unwarranted straining to reach a result different than that intended by the parties." *Id.*; *see also Wagner v. Erie Ins. Co.*, 2002 PA Super 166, ¶ 22, 801 A.2d 1226, 1234, *aff'd in part* 820 A.2d 160 (Pa. 2003) ("As the *O'Brien* court opined, 'The insurer did not eliminate the exclusionary language by providing additional coverage of the type listed in the 'personal injury' endorsement.'").

102.    Under Pennsylvania law, regardless of how the Underlying Lawsuit pleads the damages, Pennsylvania law instructs that the nature of the claim—damages arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants—controls for the purposes of the duty to defend. *See Haver*, 725 A.2d at 745.

103.    Therefore, pursuant to longstanding Pennsylvania precedent, no "personal injury" coverage is available for the Pollution Claim.

## VII.    ADDITIONAL DISPUTES

104.    As set forth above, Underlying Plaintiffs filed their Complaint against Arnold on July 1, 2013. *See* Ex. 2.

105.    Upon information and belief, Arnold knew of IEPA investigations prior to July 1, 2013, as Underlying Plaintiffs brought the Complaint against Arnold "at the request of" the IEPA and discusses IEPA investigations prior to 2013. *See* Ex. 2.

106.    Arnold did not tender the Pollution Claim to Liberty Mutual until July 12, 2019. A copy of that tender letter is attached hereto as "Exhibit 17".

107.    The Liberty CGL Policies generally contain the following conditions:

(a)    In the event of an **occurrence,** written notice containing particulars sufficient to identify the **insured** and also reason-

ably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the **insured** to the company or any of its authorized agents as soon as practicable.

(b)     If claim is made or suit is brought against the **insured,** the **insured** shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

(c)     The **insured** shall cooperate with the company and, upon the company's request, assist in making settlements. in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damage with respect to which insurance is afforded under this policy: and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The **insured** shall not, except at his own cost, voluntarily make any payment. assume any obligation or incur any expense other than for first aid to others at the time of accident.

108.    Liberty Mutual did not receive timely notice from Arnold of the Underlying Lawsuit, or any iteration of the Complaint.

109.    Moreover, Arnold entered into the Consent Order prior to notifying Liberty Mutual of its intentions and without Liberty Mutual's consent.

110.    Therefore, Arnold breached conditions (a) and (c) of the Liberty CGL Policies.

111.    Further, the Liberty CGL Policies contain the following exclusion, providing that the Liberty CGL Policies do not apply

(k)     to **property damage** to

(1)     property owned or occupied by or rented to the insured, or

(2)     property used by the insured, or

      (3)     property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control . . .

112.    Coverage for the Pollution Claim is precluded by operation of Exclusion (k).

## COUNT I

## DECLARATORY RELIEF
## AGAINST DEFENDANT

113.    The allegations contained in paragraphs 1 through 112 of this Complaint are incorporated herein by reference as though set forth at length herein.

114.    The Liberty CGL Policies are subject to interpretation under Pennsylvania law.

115.    There is no coverage for the Pollution Claim as a result of the pollution exclusions in the Policies.

116.    Any "personal injury" coverage provided by the Liberty CGL Policies does not provide coverage for the Pollution Claim.

117.    Still further, Exclusion (k) in the Liberty Mutual CGL Policies bars coverage for the Pollution Claim.

118.    Even assuming that Liberty Mutual may be obligated to pay damages for the Pollution Claim, such payments would be subject to the Limits of Liability provisions in the Policies.

119.    Even assuming that Arnold is entitled to coverage for the Pollution Claim, the damage at issue with respect to the Pollution Claim arose out of continuous or repeated exposure to substantially the same general conditions and should be considered as the result of one occurrence.

120.    An actual controversy has arisen between the parties in that Arnold:

(a)    denies that the pollution exclusion bars coverage for the Pollution Claim;

(b)    believes "personal injury" coverage provides coverage for the Pollution Claim; and

(c)    denies that Exclusion (k) precludes coverage for the Pollution Claim.

121.    Consequently, Liberty Mutual seeks a declaration of its rights and obligations in connection with the question of whether coverage exists under the Liberty CGL Policies for the Pollution Claim.

**WHEREFORE**, Plaintiff Liberty Mutual Insurance Company respectfully requests that this Court enter an Order declaring that:

(a)    The Liberty CGL Policies are subject to interpretation under Pennsylvania law.

(b)    There is no coverage for the Pollution Claim as a result of the pollution exclusions in the Liberty CGL Policies.

(c)    There is no coverage for the Pollution Claim as a result of Exclusion (k).

(d)    Even assuming that Arnold is entitled to coverage for the Pollution Claim, any amount that Liberty Mutual may be obligated to pay as damages for the Pollution Claim is subject to the Limits of Liability provisions in the Liberty CGL Policies.

(e)    The damage at issue with respect to the Pollution Claim arose out of continuous or repeated exposure to substantially the same general conditions and should be considered as the result of one occurrence.

(f)    For such other or alternative relief consistent with the claims and causes asserted in this Complaint.

**COUNT II**

**BREACH OF CONTRACT**
**AGAINST DEFENDANT**

122.    The allegations contained in paragraphs 1 through 121 of this Complaint are incorporated herein by reference as though set forth at length herein.

123.    Liberty Mutual has no obligation to pay on the Pollution Claim because Arnold failed to provide notice to Liberty Mutual or CIC as soon as practicable.

124.    Liberty Mutual has no obligation to pay on the Pollution Claim because Arnold entered into the Consent Order without Liberty Mutual's consent.

125.    An actual controversy has arisen between the parties in that Arnold:

(a)    denies that it provided late notice of the Pollution Claim; and

(b)    denies that Liberty Mutual is not required to provide indemnity coverage for the Consent Order.

126.    Consequently, Liberty Mutual seeks a declaration of its rights and obligations in connection with the question of whether coverage exists under the Liberty CGL Policies for the Pollution Claim.

**WHEREFORE**, Plaintiff Liberty Mutual Insurance Company respectfully requests that this Court enter an Order declaring that:

(a)    Liberty Mutual has no obligation to pay on the Pollution Claim because Arnold failed to provide notice to Liberty Mutual as soon as practicable.

(b)    Even assuming that Arnold is entitled to coverage for the Pollution Claim, any amount that Liberty Mutual may be obligated to pay as damages for the Pollution Claim is subject to the Limits of Liability provisions in the Liberty CGL Policies.

(c)      For such other or alternative relief consistent with the claims and causes asserted in this Complaint.

POST & SCHELL, P.C.

Date: July 10, 2025           By   s/Richard J. Barca

           John C. Sullivan
           Richard J. Barca
           Lisa A. Reilly
           Three Logan Square – 24th Floor
           1717 Arch Street
           Philadelphia, PA  19103
           Phone:  (215) 587-1000
           Fax:  (215) 587-1444
           E-mail:  jsullivan@postschell.com;
                    rbarca@postschell.com;
                    lreilly@postschell.com
           Attorneys for Plaintiff, Liberty Mutual Insurance Company